In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 14-2610

TONY THOMAS,

*Petitioner-Appellant,*

*v.*

TARRY WILLIAMS, Warden of the
Stateville Correctional Center,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07 CV 6443 — **Charles R. Norgle**, *Judge.*

———————————

ARGUED FEBRUARY 18, 2016 — DECIDED MAY 18, 2016

———————————

Before WOOD, *Chief Judge*, and KANNE and SYKES, *Circuit
Judges*.

KANNE, *Circuit Judge*. A jury convicted Tony Thomas of the
2001 murder of Khatim Shakir. In January 2005, after his con-
viction was final, Thomas received a letter from his trial attor-
ney informing him that unidentified gang members told po-
lice that Thomas did not commit the murder, but rather, that
the shooter was a drug dealer named Robert Pinkston.

In April 2005, Thomas filed a petition for post-conviction relief in state court arguing that he was actually innocent in light of the newly discovered evidence. After unsuccessfully pursuing that petition, Thomas filed a second petition in state court in 2007. This time Thomas alleged that the government withheld evidence that the officer was told that Pinkston was the shooter in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The state court held that the claim was defaulted because Thomas did not raise it in his first state post-conviction petition.

Before us is Thomas's federal petition for a writ of habeas corpus, in which he re-raises the *Brady* claim. The district court denied relief on Thomas's *Brady* claim, holding that it was procedurally defaulted. Because we agree that Thomas's *Brady* claim is procedurally defaulted, we affirm the district court's denial of his petition.

## I. BACKGROUND

We address the complicated fifteen-year history of this case beginning with the underlying murder, followed by an explanation of Thomas's trial, direct appeal, state post-conviction proceedings, and finally, the federal proceedings.

### A. The Murder

Sometime between 11:30 p.m. and midnight on September 22, 2001, Officer John Massi observed several individuals engaged in a heated conversation outside the Thousand Liquors, located at the intersection of Belmont and Sheffield Av-

enues in Chicago. Officer Massi ordered the group to disperse. Thomas,[1] a member of the Gangster Disciples, responded that he "wasn't about to take any shit off of anyone … . [I]f any of the local gangbangers fuck with me, I'm going to come back with my shit and blow them away." Thomas then left in a taxi with some friends.

Later that night, the victim, Khatim Shakir, a member of the Latin Kings, was at a party with his girlfriend, Vanessa Perez, and friends Fernando Cota, Joseph Igunbor, and Henry Igunbor.[2] The group left the party to go to Thousand Liquors to meet up with another Latin King, Gregory Hoyos. While outside the liquor store, a man approached Hoyos and said "what's up, motherfucker, G.D.," indicating that he was a member of the Gangster Disciples. The man then stated that he was a "King killer," at which point he pulled a gun from his waistband and pointed it at Hoyos. He fired the gun four or five times while Hoyos and Shakir ran across the street. Shakir collapsed and died at the scene. Chicago police responded at 2:25 a.m. Perez, Cota, the Igunbors, and Hoyos all identified Thomas as the shooter in a photo array or lineup (or both).

*B. Thomas's Trial, Conviction, and Direct Appeal*

At trial, all five eyewitnesses again identified Thomas as the shooter. Thomas's defense was alibi, specifically that he

---

[1] Officer Massi identified Thomas as the individual who spoke, and Thomas admitted that he was present and said something to the officer.

[2] There is some confusion as to the victim's and witnesses' affiliation with the Latin Kings. For example, Henry Igunbor testified at trial that Shakir and Cota were former members of the Latin Kings, but that he and his brother Joseph were never members.

was on the south side of Chicago fighting with his girlfriend, Delilah Cruz, and therefore could not have committed the murder. Thomas took the stand and testified that after Officer Massi ordered him to leave, he, Cruz, and three friends got into a taxi and went to Gill Park. At 12:30 a.m., Thomas paid a man to drive him and Cruz back to the south side where Thomas lived with his mother. The man only drove them to 63rd and Yale, at which point the couple decided to take a bus. Instead, they got into a fight around 1:00 a.m. Cruz testified that Thomas tried to hit her, so she said she was calling the police, which she did shortly thereafter. Thomas then fled the scene. A police report—which was not admitted into evidence at trial—indicates that Cruz told police the fight occurred around 1:15 a.m.

Thomas testified that after he left Cruz, he paid someone else to drive him the rest of the way to his mother's house. He said he arrived home around 2:00 a.m., argued with his mother for 45 minutes, made some phone calls to his child's mother and his sister,[3] and then went to bed.

Thomas's mother testified that he arrived home around 2:30 a.m., and they had argued. She admitted on cross-examination, however, that she had originally told police she did not see him until 5:00 a.m. In addition, an assistant state's attorney testified that Thomas's mother had at one point told him that Thomas arrived home at exactly 2:37 a.m.

Thomas's sister testified that he called her around 3:00 a.m., but she admitted that she may have originally told in-

---

[3] Phone records reveal that the first of these phone calls was made at 3:00 a.m.

vestigators that he called her at exactly 2:37 a.m. Thomas's uncle testified that he was at the house watching a movie and that Thomas had arrived home and argued with his mother. But, Thomas's uncle admitted that he originally told police that he was not home that morning until 7:00 a.m. Thomas's child's mother testified that Thomas called her from his mother's house around 2 or 3 a.m.

A jury convicted Thomas of first-degree murder, and the state trial court sentenced him to seventy-five years' imprisonment. The Illinois Appellate Court affirmed his conviction, and the Illinois Supreme Court denied his petition for leave to appeal on November 24, 2004.

*C. State Post-Conviction Proceedings*

In state court, Thomas filed two state post-conviction petitions—in April 2005 and November 2007. He also filed a suit for declaratory relief under Illinois's Freedom of Information Act (FOIA) after being denied access to Chicago Police Department (CPD) records.

*1. First State Post-Conviction Petition—April 2005*

On April 27, 2005, Thomas filed his first pro se state post-conviction petition, arguing that he was "actually innocent" in light of newly discovered evidence showing that the murderer was a drug dealer named Robert Pinkston. In support of his petition, Thomas attached a letter ("Strunck letter") dated January 12, 2005, from his trial attorney, Robert Strunck, to the assistant state's attorney. The Strunck letter said:

> I have recently received hearsay information from someone who works in the neighborhood of the homicide that the beat officer, John Massi, was informed by some of the various neighborhood gang

> members that Tony Thomas did not commit the homicide and that a drug dealer named Robert Pinkston did. Obviously, this information was not known to me at the time of the trial.
>
> Due to the evidence which had Tony Thomas battering his girlfriend on 63rd Street shortly before this homicide on Belmont Avenue, I would appreciate it if Pinkston could be looked into.

Thomas also attached a CPD report that showed that Cota, after looking through a CPD photo book, identified Pinkston as resembling Shakir's killer. According to the report, Cota indicated that the resemblance between Pinkston and the shooter was an eight out of ten, but that the shooter was a little older.

The state trial court denied Thomas's post-conviction petition, and the state appellate court affirmed on February 7, 2007, noting that "an unauthenticated letter with several layers of hearsay" was insufficient to raise "the gist of a meritorious claim of actual innocence," in light of the overwhelming evidence presented against Thomas at trial. The Illinois Supreme Court denied leave to appeal on May 31, 2007.

*2. Successive State Post-Conviction Petition—November 2007*

On November 6, 2007, Thomas filed a motion for leave to file a successive post-conviction petition in state court, arguing that the state withheld exculpatory evidence that Pinkston committed the murder in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In addition to the Strunck letter, Thomas attached an affidavit from his attorney, Gayle Horn ("Horn affidavit"). The Horn affidavit indicated that she spoke with Strunck, who told her "that the person who works in the neighborhood who provided him with this information is

named either George or Jorge. Mr. Strunck said that he met George or Jorge in a cigar store nearby." Thomas attached a second affidavit from Margaret Betts ("Betts affidavit"), which said that she was on a three-way phone call between Thomas and Detective Tony Villardita who "confirmed that he knew that Officer John Massi was told by several people that Mr. Thomas did not commit the homicide of Khatim [Shakir]."

The trial court denied Thomas leave to file the successive petition. The appellate court affirmed, finding that Thomas failed to show cause for not raising his *Brady* claim in his first post-conviction petition as required by 725 ILCS 5/122-1(f). The Illinois Supreme Court denied leave to appeal on November 24, 2010.

### 3. *State FOIA Lawsuit—August 2008*

On August 28, 2008, Thomas filed a lawsuit in state court seeking declaratory relief from the CPD's denial of his request for documents made pursuant to Illinois's FOIA statute. The trial court dismissed his suit on September 11, 2008. Thomas appealed, but he moved to voluntarily dismiss his appeal because he had filed in the wrong venue. The motion was granted on May 6, 2010. He then refiled the FOIA lawsuit in the proper state venue.

### D. *Federal Proceedings*

Shortly after filing his second petition in state court, on November 14, 2007, Thomas filed a 28 U.S.C. § 2254 petition in federal court. Thomas did not raise his *Brady* claim in the petition. But, on February 4, 2008, the district court granted Thomas's motion to stay the proceeding while he exhausted his state remedies.

On June 7, 2011, Thomas filed a renewed motion to stay the federal § 2254 proceedings or to file an amended § 2254 petition. The district court granted the motion to continue the stay, but it denied his motion to file an amended petition. Thomas filed another motion to continue the stay, which the district court denied on October 24, 2011, resuming the federal proceeding. Although the district court denied Thomas leave to file an amended petition, Thomas did so anyway on November 17, 2011, raising his *Brady* claim for the first time in federal court.

Then, on February 27, 2012, the district court granted yet another of Thomas's motions to stay the proceedings because the state appellate court had granted Thomas leave to file a late appeal in his FOIA lawsuit. Finally, on June 20, 2013, the district court lifted the stay for the final time. Thomas voluntarily dismissed several claims, and he filed a second amended § 2254 petition on December 20, 2013.

On June 17, 2014, the district court denied Thomas's second amended petition. It found that Thomas did not raise his *Brady* claim in state court until his second state post-conviction petition. The state court had dismissed the claim under a state procedural rule, namely for failing to have raised it in the first state post-conviction petition. Because the state procedural rule constituted an independent and adequate state ground, the district court held that Thomas's *Brady* claim was procedurally defaulted. The district court also found that Thomas had not made a showing of actual innocence that would excuse his procedural default. The district court refused to grant a certificate of appealability.

This court granted a certificate of appealability on June 18, 2015, finding that Thomas made a "substantial showing of the

denial of a constitutional right" on his *Brady* claim. In addition, we asked the parties to address both procedural default and timeliness in light of Thomas's claim of actual innocence.

## II. ANALYSIS

We will not address the merits of Thomas's *Brady* claim unless we are first satisfied that the claim has not been procedurally defaulted. On appeal, Thomas argues that his *Brady* claim is not procedurally defaulted because he fairly presented it to the state courts in his first state post-conviction petition filed in April 2005. Alternatively, he contends that any procedural default is excused because he has presented sufficient evidence for a finding of actual innocence. We disagree and conclude that Thomas did not fairly present his *Brady* claim to the state court in his 2005 petition nor has he shown sufficient evidence of actual innocence to excuse the procedural default.

### A. Procedural Default

We review a district court's decision on whether a claim was procedurally defaulted *de novo*. *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010).

There are two distinct ways in which a state prisoner can procedurally default a federal claim. The first, relied upon by the district court, comes from the independent and adequate state ground doctrine. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). In the context of federal habeas corpus, the doctrine applies to preclude review where the state courts declined to address a petitioner's federal claims because the petitioner did not meet state procedural requirements. *Id.* In those cases, the state court judgment rests on an independent and adequate state ground, and principles of comity and federalism

dictate against upending the state-court conviction, and instead, finding that the petitioner's claim is procedurally defaulted. *Id.* at 30.

The second comes from the rule that before pursuing post-conviction relief in federal court, a state prisoner must "exhaust[] the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), by giving the state courts an "opportunity to act on his claims," *O'Sullivan v. Boerckel*, 526 U.S. 838, 842–44 (1999). Such an opportunity requires that the state prisoner "fairly present" the federal issue for the state court's review. *Ward*, 613 F.3d at 696. Thus, "when the federal issue was not fairly presented to the state courts and those courts would now hold the claim procedurally barred," the procedural default doctrine precludes federal post-conviction review of the federal claim. *Id.*

Thomas's *Brady* claim is procedurally defaulted under either rule. The first time that Thomas labeled his claim a *Brady* claim in state court was in his second state post-conviction petition filed in November 2007. The state court denied his petition because he did not show cause for his failure to raise the claim in his first state post-conviction petition. *See* 725 ILCS 5/122-1(f). The state procedural rule is an adequate and independent state ground precluding federal habeas review of the *Brady* claim raised in his second state petition.

But, for the first time on appeal,[4] and in an effort to avoid the obvious procedural default from his second state petition,

---

[4] We acknowledge that "arguments raised for the first time on appeal are waived," *Coleman v. Hardy*, 690 F.3d 811, 818 (7th Cir. 2012), but because the parties addressed and argued the merits of procedural default, we rule on those grounds.

Thomas argues that he raised his *Brady* claim before the state court in his *first* state post-conviction petition filed in April 2005. The question then is whether Thomas fairly presented his *Brady* claim to the state court in his first petition such that the state court should have been on notice as to the federal constitutional claim.

A claim is fairly presented where "the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001) (quotation marks omitted). Although fair presentment generally requires the petitioner to present "[b]oth the operative facts and controlling law" to the state court, we focus on four factors:

> (1) whether the habeas petitioner relied on federal cases that engage in constitutional analysis, (2) whether the petitioner relied on state cases that apply constitutional analysis to similar facts, (3) whether the petitioner framed the claims in terms so particular as to call to mind a specific constitutional right, and (4) whether the petition alleges a pattern of facts within the mainstream of constitutional litigation.

*McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013) (citing *Ellsworth*, 248 F.3d at 639)).

In conducting this analysis, we take care to construe Thomas's pro se petition liberally, *id.*, but even a generous construction cannot save his claim from procedural default. In his first state post-conviction petition, Thomas asserted an "actual innocence claim," supported by the Strunck letter, and

he argued that the evidence "shows that the defendant is factually innocent." He sought a new trial in light of "the newly discovered evidence of the defendant's innocence."

The first three *Ellsworth* factors are not present. Thomas did not present the law controlling a *Brady* claim, nor did he offer any federal or state cases engaging in a *Brady* analysis. His petition also was not framed in terms "so particular as to call to mind a specific constitutional right." *McDowell*, 737 F.3d at 482. Thomas did not attribute to the government any withholding of evidence or allege that the evidence was available at the time of trial but not disclosed.

Thus, Thomas relies on the fourth *Ellsworth* factor, arguing that he alleged "a pattern of facts that is well within the mainstream of constitutional litigation." *Id*. But, Thomas alleged that Officer John Massi "has recently received information" that Pinkston may have been the shooter. Recent discovery of evidence did not constitute a typical *Brady* claim then, and the Supreme Court has since said that *Brady* only applies to evidence existing at the time of trial. *Dist. Atty's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009). Furthermore, Thomas argued that the recently discovered evidence showed he was "actually innocent." We agree that the pattern of facts Thomas alleged was within the mainstream of constitutional litigation, but for a state-law actual innocence claim, which the state court did address. The pattern of facts alleged is not within the mainstream of *Brady* litigation.

Without more facts alleging that the government knew of the evidence at the time of trial and withheld it or some citation to the Constitution or cases applying *Brady*, the state court could not have been on notice sufficient to give it an opportunity to act on Thomas's *Brady* claim, particularly in light

of the fact that Thomas alleged facts bringing to mind a completely different claim.

In support of his theory that he fairly presented his *Brady* claim, Thomas relies on *Lewis v. Sternes*, 390 F.3d 1019 (7th Cir. 2004). In *Lewis*, we held that a *Brady* claim was fairly presented where the pro se petitioner had labeled the section "Ineffective Assistance of Trial Counsel," but he alleged "that authorities in advance of trial had improperly destroyed the clothes he was wearing at the time of his arrest." *Id.* at 1021–22. Thomas's factual allegations are much less clear than those in *Lewis*. Allegations of destruction of evidence before trial fall clearly within the realm of a *Brady* violation and outside the realm of a typical ineffective assistance of counsel claim. Lewis's allegations, therefore, were inconsistent with the label he attached to them, whereas the facts Thomas alleged were perfectly consistent with the label of an actual innocence claim, not with a *Brady* claim.

Absent other indicators of a *Brady* claim, such as a citation of authority, Thomas's allegations are insufficient to establish fair presentment of his *Brady* claim to the state court. *Compare McDowell*, 737 F.3d at 482 (holding claim was not fairly presented where petition alleged that a photo was shown "in such a suggestive manner that there was little room to exclude him," but there was no citation to the federal or state constitution, case law, or facts upon which to evaluate the claim of suggestiveness), *and Perruquet v. Briley*, 390 F.3d 505, 520–21 (7th Cir. 2004) (holding that claim was not fairly presented where petitioner did not mention due process or the federal constitution and relied only on cases discussing state law in challenging the rejection of his self-defense theory), *with Ellsworth*, 248 F.3d at 639–40 (holding claim was fairly presented

despite the absence of a citation to the federal constitution be-
cause of presence of the remaining three factors). Accordingly,
Thomas's *Brady* claim is procedurally defaulted.

*B. Excuse for the Procedural Default—Actual Innocence*

Procedural default may be excused, however, where the
petitioner demonstrates either (1) "cause for the default and
actual prejudice" or (2) "that failure to consider the claims will
result in a fundamental miscarriage of justice." *Coleman*, 501
U.S. at 750.

Thomas does not contest on appeal the district court's
finding that he had not shown good cause for failing to raise
his *Brady* claim in his original state post-conviction petition.
Instead, he relies on the "fundamental miscarriage of justice"
exception to excuse his procedural default.

To demonstrate a fundamental miscarriage of justice, a pe-
titioner must show that "a constitutional violation has proba-
bly resulted in the conviction of one who is actually innocent"
such that "it is more likely than not that no reasonable juror
would have convicted [the petitioner] in the light of the new
evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quotation
marks omitted). Although not subject to strict rules of admis-
sibility, "'[t]o be credible' a gateway claim requires 'new reli-
able evidence—whether it be exculpatory scientific evidence,
trustworthy eyewitness accounts, or critical physical evi-
dence—that was not presented at trial.'" *House v. Bell*, 547 U.S.
518, 537 (2006) (alteration in original) (quoting *Schlup*, 513 U.S.
at 324).

Thomas presents three pieces of new evidence in support
of his actual innocence: the Strunck letter, the Horn affidavit,
and the Betts affidavit. None of the information contained in

these sources is "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" that would give his claim of actual innocence credibility. *Id.* Rather, the information is hearsay within hearsay. We do not know the identity of any of the declarants so that the content of what was said can be verified. At oral argument, Thomas offered no explanation as to why he did not provide an affidavit from Officer Massi or from any of the "gang members" or "several people" who have said that Robert Pinkston committed the murder. The utter lack of corroboration of the contents of the letter and affidavits weighs heavily against finding the information to be credible.

Thomas relies on the fact that the Strunck letter and Horn affidavit are from lawyers who have "an obligation to be truthful to the court," and thus, the information contained in the letters is trustworthy.[5] *See In Re A.V.*, 674 N.E.2d 118, 121 (Ill. App. Ct. 1996), *overruled on other grounds by People v. Colon*, 866 N.E.2d 607 (Ill. 2007). We harbor no doubts that these lawyers truthfully described what they were told. But that is beside the point. The truth of the *content* of what the lawyers were told—that Pinkston killed Shakir—cannot be established from uncorroborated hearsay evidence of unknown declarants. Thus, the lawyers' statements have little probative value in establishing the "fact" of Thomas's innocence.

---

[5] Betts is not an attorney. In fact, we do not know who she is because her affidavit only describes the content of the three-way call she made on Thomas's behalf. Even if we assume that her affidavit is true, it meets the same demise as the lawyers' statements. The "truth" of Thomas not having committed the murder cannot be established.

That is because the new evidence must be "considered in light of the proof of petitioner's guilt at trial." *Herrera v. Collins*, 506 U.S. 390, 418 (1993). At trial, five different eyewitnesses identified Thomas as the shooter. Although Cota did initially point out Pinkston's photo as resembling the shooter, he later identified Thomas in a photo array, live lineup, and at trial. The other four eyewitnesses also identified Thomas multiple times.

In addition, Officer Massi placed Thomas at the scene of the murder hours before it happened, and Thomas threatened to "come back with [his] shit and blow [local gangbangers] away." The police report corroborates that Thomas threatened his girlfriend around 1:15 a.m. But that left Thomas over an hour to return to Thousand Liquors, which he himself testified was only 35 minutes away. With the exception of his child's mother, Thomas's alibi witnesses were all family members who gave conflicting reports to the police and at trial as to his whereabouts and the times they had seen him. Finally, phone records do corroborate that Thomas made phone calls from his mother's house at 3:00 a.m. But that was *at least* 35 minutes after the shooting occurred because the police responded at 2:25 a.m., leaving Thomas sufficient time to travel to his mother's house.

Given the overwhelming evidence of his guilt and the questionable reliability of his alibi, we do not find that it is more likely than not that a jury would not have convicted Thomas based solely on evidence that unidentified gang members told someone who told someone that Thomas did not commit the murder. Thus, Thomas's gateway claim of actual innocence is insufficient to excuse his procedural default.

**III. C**onclusion

For the foregoing reasons, we AFFIRM the district court's denial of Thomas's petition for a writ of habeas corpus.