In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1113

JAMES SNOW,

*Petitioner-Appellant*,

*v.*

RANDY PFISTER,[*]

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cv-3947 — **Elaine E. Bucklo**, *Judge*.

ARGUED OCTOBER 25, 2017 — DECIDED JANUARY 25, 2018

Before KANNE and SYKES, *Circuit Judges*, and DARROW, *District Judge*.[**]

[*] Michael Lemke was replaced by Randy Pfister, the current warden of Stateville Correctional Center. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Court.

[**] Of the United States District Court for the Central District of Illinois, sitting by designation.

KANNE, *Circuit Judge*. James Snow was convicted of murder and sentenced to natural life in prison. In a petition for a writ of habeas corpus, he alleges that his constitutional rights were violated when his trial counsel failed to provide effective assistance and when the prosecutor failed to disclose material evidence helpful to the defense. The district court denied the petition. We affirm.

## I.    BACKGROUND

William Little was shot to death while working at the Clark Street gas station in Bloomington, Illinois on March 31, 1991. Officer Pelo of the Bloomington Police Department was the first law enforcement officer to respond. No one other than Little was found in the station. Danny Martinez told investigators that he was walking towards the station after filling his tires when he heard two loud "pops." He turned to check on his car. When he turned back towards the station, he saw a man walking backwards out of the door. He said he came within a few feet of the man. Carlos Luna told investigators that he was looking out of his window across the street from the station at the time of the incident and that he saw a white male who appeared to be carrying something under a long trench coat walking out of the gas station. A third witness, Gerado Gutierrez, told the investigators that he purchased fuel at the station around the time of the incident and that when he entered the station to pay, he saw another man with the attendant who appeared to be trying to avoid being seen. No suspect was immediately apprehended.

In April 1991, James Snow was arrested for robbing a different gas station in Bloomington, Illinois. It took the police several hours to find Snow hiding in the attic of his sister's house in Missouri to complete the arrest. He was transported

back to Bloomington, where he was interviewed by police. According to the officers who transported and questioned Snow, he repeatedly asked about the Little homicide investigation and asked "what would happen to him if he knew something about the murder." (R. 47-6 at 121.)

Snow was then called to participate in a lineup. He initially refused to participate. Carlos Luna viewed the lineup and stated that Snow looked like the man he saw leaving the gas station on March 31. Danny Martinez also viewed the lineup and indicated that he thought two of the individuals, neither of whom was Snow, looked like the man he saw at the station that night, but he made no identification.

After the lineup, Snow moved to Florida. He returned to Bloomington in July 1993, and in October 1994, he pleaded guilty to obstruction of justice for attempting to persuade a girlfriend to lie about his involvement in another crime. Snow was incarcerated until February 1996. Upon his release, he moved back to Florida.

In September 1999, Snow was indicted in Illinois state court for the murder of William Little. Snow was apprehended later that month in Ohio. When first approached by the police, Snow provided a false name and identification. He then fled after the officer attempted to view a tattoo on his calf. He was arrested a short time later hiding under the porch of a nearby home.

Susan Claycomb was also charged for the crime. Her case went to trial before Snow's, and she was acquitted. According to the state's theory at Snow's trial, Claycomb was Snow's getaway driver.

In 2000, G. Patrick Riley and Frank Picl were appointed to represent Snow. At the end of that year, Snow sent the trial judge a letter stating he believed his attorneys were unprepared for trial. He subsequently sought a continuance. The judge questioned the attorneys, determined they were adequately prepared for trial, and denied the request.

Snow's trial began in January 2001 and lasted nine days. In all, the state called forty-three witnesses, and Snow called fifteen. The state called Martinez and Luna as eyewitnesses. Martinez identified Snow and testified about seeing someone exit the gas station as he approached it on the night of March 31, 1991. He admitted he had not identified Snow in photographs or in the lineup, but had later identified him from a picture in the newspaper after Snow was arrested years after the murder. Luna made no in-court identification of Snow, but testified regarding his statements given to the investigators on the night of the murder.

Officer Pelo testified about receiving the dispatch call on March 31, 1991. He stated that he saw Martinez filling his tires and approaching the station. He did not see anyone leave the station.

Twelve other witnesses testified that, at various times, Snow admitted responsibility for the murder or otherwise indicated that he was involved in the crime.[1]

---

[1] For details regarding these witnesses' testimonies, see the district court's memorandum opinion and order. *Snow v. Pfister*, 240 F.Supp. 3d 854 (N.D. Ill. 2016).

Snow testified in his own defense, claiming to have been at home with his wife on the night in question. His wife also testified that Snow was home with her on March 31, 1991.

In his closing argument, Snow's counsel highlighted inconsistencies between the testimonies of the state's witnesses, particularly between the different accounts of Martinez and Pelo. He also pointed out that none of the witnesses contacted authorities after Snow allegedly confessed to the crime and that many of the state's witnesses had lengthy criminal histories.

The state focused on the testimony of the eyewitnesses and of the witnesses who said Snow implicated himself in the crime. The state also highlighted as evidence of guilt Snow's refusal to participate in the lineup, his flight to Ohio following his indictment, his attempt to use a false identification when apprehended in Ohio, and the fact that Snow never provided an alibi before trial, despite knowing he was a suspect for years.

The jury found Snow guilty of first degree murder. After the trial, Snow sent two letters to the trial court asserting his attorneys had provided ineffective assistance of counsel. The trial judge held a hearing, reviewed Snow's complaints, and denied the motion. The trial judge also denied Snow's motion to reconsider. The Illinois appellate court denied Snow's direct appeal, and the Illinois Supreme Court denied his petition for leave to appeal.

In 2004, Snow filed a *pro se* petition for postconviction relief. In 2008, the Exoneration Project began representing Snow. It filed an amended petition citing new evidence in

support of Snow's ineffective assistance claim, including evidence that one of Snow's trial attorneys had since been disbarred. The Illinois circuit court denied the postconviction petition, the Illinois appellate court affirmed the denial, and the Illinois Supreme Court again denied Snow's petition for leave to appeal.

Snow filed the instant petition for habeas corpus relief in federal court in May 2013. Shortly thereafter, Snow discovered additional evidence and filed a motion for leave to file a successive postconviction petition in state court. The proceedings in federal court were stayed pending the proceedings in state court. The Illinois circuit court denied the motion for leave to file a successive postconviction petition, the Illinois appellate court affirmed, and again the Illinois Supreme Court denied Snow's petition for leave to appeal. The federal district court then lifted the stay and addressed the merits of the petition for a writ of habeas corpus. The district court denied the petition, and this court certified the claims for appeal. For the following reasons, we affirm the judgment of the district court.

## II.    ANALYSIS

This court reviews the district court's denial of habeas corpus relief *de novo*. *Campbell v. Reardon*, 780 F.3d 752, 761 (7th Cir. 2015). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the federal court may grant a federal petition for habeas corpus only if the state court's ruling on the federal constitutional question "'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting

28 U.S.C. § 2254(d)). This standard is "'difficult to meet' and 'highly deferential.'" *Id*. (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). A petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 761–62 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

This "deferential standard of review applies only to claims that were actually 'adjudicated on the merits in State court proceedings.'" *Id.* at 762 (quoting § 2254(d)). For each claim, we review the decision of the last state court to address its merits. *Id.*

In addition to the merits of Snow's claims, we must consider which claims have been procedurally defaulted. "There are two distinct ways in which a state prisoner can procedurally default a federal claim." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). In cases where the state court declines to address a petitioner's federal claims because the petitioner did not meet state procedural requirements, "principles of comity and federalism dictate against upending the state-court conviction, and instead, finding that the petitioner's claim is procedurally defaulted." *Id.*

The second type of procedural default stems from the requirement that a state prisoner must exhaust his remedies in state court before seeking relief in federal court. *Id.*; § 2254(b)(1)(A)). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To exhaust state remedies in the Illinois courts, the

prisoner must include his claims in a petition for leave to appeal to the Illinois Supreme Court. *Id*. at 845–46.

"Procedural default may be excused … where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Thomas*, 822 F.3d at 386 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Snow's claims fall into two substantive categories: claims of ineffective assistance of trial counsel and claims that the state failed to disclose material evidence helpful to the defense. We address each category in turn, including analyses of which claims have been procedurally defaulted.

### A. Ineffective Assistance of Counsel

To succeed on a claim of ineffective assistance of counsel, a plaintiff must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that the errors deprived the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The plaintiff must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. When asserting an ineffective assistance of counsel claim in the context of an AEDPA petition for habeas corpus relief, the prisoner must show that the state court's decision is contrary to or involved an unreasonable application of this standard. *Campbell*, 780 F.3d at 761–62.

The Illinois appellate court dismissed Snow's ineffective assistance of counsel claims under the doctrine of *res judicata*, therefore, the circuit court was the last court to review the merits of the claims. *Res judicata* is "not a bar to consideration

of claims in a federal habeas action." *Davis v. Lambert*, 388 F.3d 1052, 1058 (7th Cir. 2004) (quoting *Moore v. Bryant*, 295 F.3d 771, 776 n. 1 (7th Cir. 2002)). So we review the opinion of the Illinois circuit court, which granted the state's motion to dismiss these claims.

Snow alleges his appointed attorneys provided ineffective assistance of counsel, and that the Illinois court's contrary conclusion is unreasonable. First, he argues that counsel failed to use available evidence, or failed to perform the necessary investigation to discover evidence, to impeach Martinez and Luna. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Second, he alleges his attorney was suffering from alcoholism during the trial.

1. *Procedurally defaulted ineffective assistance of counsel claims*

Snow did not specifically allege in the petition for leave to appeal that his attorneys were ineffective because they failed to call Officer Sanders to testify regarding Carlos Luna's ability to describe Snow after the incident. Nor did the petition address whether counsel was ineffective for failing to call Officer Williams to testify regarding what he saw at the gas station on the night of the murder.

There was no reason Snow could not have included both of these claims in his initial petition for leave to appeal. Issues not raised in the petition are not properly before the court and are considered forfeited. *People v. Fitzpatrick*, 986 N.E.2d 1163, 1170 (Ill. 2013). The fact that an Illinois Supreme Court rule limits the number of pages in a petition for leave to appeal

does not excuse a petitioner from the requirement. Therefore, Snow cannot establish cause, and he does not allege that this court's refusal to review these allegations will result in a fundamental miscarriage of justice. These claims, therefore, are defaulted, and we will not review their merits.

Snow's remaining ineffective assistance claims were properly raised in his first postconviction petition and first petition for leave to appeal, and the Illinois circuit court addressed the claims on their merit. These claims, discussed below, are not defaulted.

2.  *Statements tending to impeach Martinez*

Snow argues that, had counsel properly investigated and questioned the state's witnesses, Martinez's testimony would have been impeached at trial. In his initial postconviction petition and subsequent petition for leave to appeal, Snow alleged claims of ineffective assistance of counsel based on statements made by Officer Pelo, by Dennis and William Hendricks, by Detective Crowe, and by Martinez himself. The Illinois appellate court rejected each of these claims. Therefore, these claims were not procedurally defaulted. The district court found that the Illinois court's conclusion was based on the reasonable application of federal law. We agree.

At trial, Officer Pelo testified that he did not see anyone leave the gas station, which contradicted Martinez's account. On the night of the murder, however, Pelo told investigators specifically that he was looking back and forth between Martinez and the front of the station and that he did not see anyone else. Thus, Snow urges, if Pelo's testimony is true, Martinez must be lying. Snow argues that this direct contradiction

was not presented at trial and that it could have been if counsel had interviewed Pelo. It is undisputed that counsel did not interview Pelo.

Snow also argues counsel should have presented the jury with testimony from Dennis and Williams Hendricks. In affidavits, the Hendrickses stated that Martinez said he knew Snow and that he did not see Snow at the crime scene. Both testified for Snow at trial, but counsel focused on eliciting testimony about another witness. Counsel acknowledged that they failed to lay the necessary foundation to use William to impeach Martinez.

Moreover, Snow contends that counsel should have interviewed and called Detective Crowe to impeach Martinez's credibility by explaining that Martinez actually identified other people, not Snow, in the initial lineup.

Finally, Snow claims counsel should have discovered police reports that contain an interview with Martinez. The reports reveal that Martinez told detectives that the victim's mother had been contacting him and that the police acknowledged that they gave Martinez's phone number to the victim's mother. This evidence could have been used to show how Martinez's testimony had been influenced.

Certainly, all of this evidence would have further impeached the credibility of one of only two eyewitnesses. Snow points out that much of this evidence was presented in his co-defendant's trial and that his co-defendant was acquitted, but the role of Martinez's testimony in that trial is unclear. Regardless, Snow cannot demonstrate that counsel's failure to solicit any of this testimony was prejudicial. At trial, Martinez's credibility was undermined. Snow's counsel pointed

out the difference in Pelo's testimony and Martinez's account of what occurred at the gas station. And Martinez himself told the jury how he was not able to identify Snow immediately after the incident. One of the attorneys explained that it was his experience that continuing to introduce cumulative impeachment evidence could do more harm than good and that he believed Martinez's credibility was sufficiently challenged. In light of the other evidence, it was reasonable for the state court to conclude that counsel's failure to introduce this evidence did not affect the outcome of the case. Therefore, Snow is not entitled to relief on this basis.

### 3. *Counsel's personal and professional problems*

Snow's assertion that he was denied effective assistance of counsel based on Picl's personal problems is easily dismissed. Frank Picl was disbarred in 2006 after he pleaded guilty to financial exploitation of an elderly person. According to testimony from Picl's sentencing hearing, he suffered from alcoholism, mental illness, and a gambling addiction dating back at least as far as the time of Snow's trial. However, Snow fails to allege any specific incident that occurred during the course of Picl's representation of Snow. *See Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."); *see also United States v. Jackson*, 930 F. Supp. 1228, 1234 (N.D. Ill. 1996) ("Alcoholism, or even alcohol or drug use during trial, does not necessarily constitute a *per se* violation of the Sixth Amendment absent some identifiable deficient performance resulting from the intoxication."). The Illinois court's determination that Picl's personal problems, without more, did not constitute ineffective assistance of counsel is

consistent with Supreme Court precedent. Snow is not entitled to relief on this basis.

### B. Brady v. Maryland *Claims*

Snow's habeas corpus petition also alleges that the state failed to disclose material evidence helpful to the defense. The failure to disclose such evidence is a violation of the accused's due process rights. *Brady v. Maryland,* 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."). There is no difference between exculpatory and impeachment evidence for these purposes. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The state's obligation under *Brady* turns on the cumulative effect of all evidence wrongly suppressed by the government. *Kyles v. Whitley*, 514 U.S. 419, 421, 437–38 (1995). To be entitled to habeas corpus relief on this basis, Snow must demonstrate that the Illinois court's decision is contrary to or involves an unreasonable application of *Brady* and its progeny. He has not.

### 1. Brady *claims raised in Snow's first postconviction petition*

Snow claims the state should have disclosed deals made with several witnesses who, he claims, received leniency in their own criminal trials in exchange for their testimony. Snow's initial postconviction petition and first petition for leave to appeal addressed whether the state has a duty to disclose deals made to witnesses in exchange for their testimony regardless of whether such information is publicly available.

The Illinois appellate concluded that no *Brady* violation occurred. Thus, these claims are not defaulted.

For those witnesses who actually received a downward sentencing departure, all court documents regarding the witnesses' sentences were publically available. It was reasonable for the state court to determine that no *Brady* violation occurred. *See United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (noting that documents were publicly available and concluding that the documents were not suppressed under *Brady*); *United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996) ("[T]he government will not be found to have suppressed material information if that information also was available to a defendant through the exercise of reasonable diligence.").

Snow also claims the state should have disclosed evidence that it coached or coerced the testimony of Steven Scheel. This claim was also included in the initial petitions and not defaulted. At trial, Scheel testified that he had known Snow since childhood and that Snow told him that he had robbed the gas station and killed the attendant. An affidavit submitted by an investigator for Snow's defense states that Scheel told investigators that he was threatened or coerced into testifying against Snow and that detectives tried to coach him on what to say. But, Scheel himself refused to sign an affidavit stating that the state had coerced his testimony, and many other witnesses testified that Snow made similar inculpatory statements. The Illinois appellate court reasonably applied *Brady* and other federal precedent and concluded that the evidence was not material.

### 2. Brady *claims raised in Snow's successive postconviction petition*

Snow's remaining *Brady* claims were raised for the first time in his successive postconviction petition. The Illinois court denied Snow leave to file this petition. The appellate court affirmed, and the Illinois Supreme Court denied his petition for leave to appeal. Therefore, Snow subjected these claims to a full round of review in state court before seeking federal review. The state court's decision, however, was based on Illinois state law. Generally, this court will not review a claim resolved by the state court on independent and adequate state law grounds. *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009). Because Snow was denied leave to file his successive petition based on the Illinois Post-Conviction Hearing Act, both parties assert that the claims were procedurally defaulted.

The Illinois Post-Conviction Hearing Act limits a petitioner to one petition. 725 ILCS 5/122-1(f). Leave to file a successive petition is required and "may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." *Id*. The Illinois court found that Snow had demonstrated cause, but not prejudice.

It is difficult to conclude that the state court's decision was based entirely on independent and adequate state grounds. "[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law and [the federal court's] jurisdiction is not precluded." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). The Illinois court had to con-

sider the merits of Snow's *Brady* claims raised in the successive petition when determining whether Snow demonstrated prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("'[C]ause and prejudice … parallel two of the three components of the alleged *Brady* violation itself.'" (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). In concluding that Snow failed to demonstrate prejudice, the court noted that the claims failed the *Brady* materiality standard.

Regardless of whether the claims are considered defaulted or are reviewed on their merits, Snow is not entitled to relief. Though he can show cause, he cannot demonstrate prejudice to avoid default, or materiality to succeed on the merits. *See Banks*, 540 U.S. at 691 ("[P]rejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes."); *see also People v. Pitsonbarger*, 793 N.E.2d 609, 621 (Ill. 2002) (explaining that the cause-and-prejudice test for filing successive postconviction petitions in Illinois mirrors the cause-and-prejudice test used by federal courts reviewing procedurally defaulted claims in habeas corpus proceedings).

Snow's successive petition included an affidavit from Ed Palumbo, one of the witnesses who testified that Snow made a statement indicating he committed the murder. In the affidavit, Palumbo claimed that he thought Snow was "bullshitting" when he made the inculpatory statement, that the prosecutor indicated that he did not think that Snow was guilty, and that he had been trying to get a "deal" in his own criminal proceedings. Because Palumbo failed to provide this testimony earlier, Snow had cause to include the evidence for the first time in his successive petition. The Illinois court specifically found Palumbo's assertion regarding the prosecutor's

statement not credible. The only other information in the affidavit potentially in the custody of the state at the time of trial, and thus the only evidence that could have been suppressed by the state, was the fact that Palumbo was seeking a deal. And the impeachment value of this evidence was limited. Palumbo stated only that he sought a deal, not that he had received one. This evidence on its own would not have likely changed the outcome of the proceeding.

The wife of another witness, Bruce Roland, also provided an affidavit stating that Roland was pressured by law enforcement to testify and that his testimony was false. Again, Snow did not have access to this testimony earlier and thus had cause to raise it for the first time in his successive petition. Roland's incentive to testify, however, was explored at trial. He conceded that he did not report Snow's inculpatory statement until he was charged with a DUI. So it is unlikely this evidence would have changed the outcome of the proceeding.

Finally, Snow argues that prosecutors should have disclosed unredacted reports from polygraph tests of Martinez and Scheel. Polygraph evidence is generally inadmissible under Illinois law. *People v. Jefferson*, 705 N.E.2d 56, 62 (Ill. 1998). The federal circuits are split on whether a *Brady* claim can be based on inadmissible evidence. *See United States v. Morales*, 746 F.3d 310, 314 (2014) (noting that the Seventh and Fourth Circuits have held that suppressed evidence must be admissible to trigger a *Brady* analysis, whereas the First, Second, Third, Sixth, and Eleventh Circuits have held the opposite). Under either standard, however, Snow's claim fails. The newly discovered notes from Martinez's test were vague and, if anything, repetitive of the fact that Martinez did not initially identify Snow. The notes from Scheel's test indicate that he

was not being truthful when he said Snow confessed to the murder. Even if Scheel could have been impeached with this evidence, it is unlikely that this evidence on its own would have changed the outcome of the case.

But our analysis does not end with the conclusion that no singular piece of suppressed evidence is material on its own. The evidence must be considered cumulatively. *Kyles*, 514 U.S. at 436–37. When all of the evidence is considered cumulatively, Snow has not proven a *Brady* violation.

The jury heard testimony from many witnesses in this case. Two of those witnesses testified regarding the person they saw exit the Clark gas station around the time the silent alarm was triggered. The jury also heard from Officer Pelo, who arrived first at the scene. Defense counsel highlighted the discrepancies in the testimony of Pelo and the witnesses, and the state explained how it thought the accounts corroborated each other.

Twelve witnesses testified that Snow at some time made an inculpatory statement to them or in their presence. Snow denied making any of these statements, and his counsel presented evidence that many of these witnesses had criminal histories and selfish reasons for testifying. It was for the jury to determine which of these witnesses were credible.

The only alibi witnesses presented by the defense were Snow and his wife, Tammy. Both testified that they were home together the entire night of the murder. Tammy testified to the grand jury, however, that it was possible Snow left at some point that evening. The trial jury was informed of her grand jury testimony.

Furthermore, the state introduced the testimony of law enforcement officers who recounted how Snow hid in the insulation in his sister's attic for five hours when police came to arrest him. Officers also testified that Snow repeatedly asked about the Little homicide investigation and inquired whether he could receive any leniency in exchange for information he had about the murder. Other officers testified that Snow presented false identification and then fled when they tried to arrest him in Ohio in 1999.

Taking all of this together, there is no reasonable likelihood that the disclosure of the contested evidence would have changed the outcome of the case.

### III.    Conclusion

The Illinois appellate court reasonably applied the standards set forth in *Strickland v. Washington* and *Brady v. Maryland* when reviewing Snow's non-defaulted claims. Even if those claims raised for the first time in Snow's successive petition were not procedurally defaulted and even when considering all of the evidence cumulatively, Snow has failed to sufficiently demonstrate a constitutional violation. Therefore, we AFFIRM the judgment of the district court. Snow's petition for a writ of habeas corpus is DENIED.