Filed 9/10/21  P. v. Adam CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES EDWARD ADAM,<br><br>Defendant and Appellant. | C090510<br><br>(Super. Ct. No. 17FE004074) |

A jury found defendant James Edward Adam guilty of residential burglary, making criminal threats, and assault with a deadly weapon.  The jury found true that defendant personally used a deadly and dangerous weapon (an axe handle) in the commission of the offenses.  The trial court denied defendant's motion for a new trial and sentenced him to three years eight months in state prison.[1]

---

[1] Defendant was sentenced to eight months for evading a peace officer (Veh. Code, § 2800.2) in a separate case.

1

Defendant appeals, arguing (1) the trial court erred in denying his motion for a new trial based on ineffective assistance of counsel, and (2) the evidence was insufficient to support the conviction for assault with a deadly weapon. We reject both contentions and affirm.

## I. BACKGROUND

### A. *The Evidence at Trial*

Defendant's mother, Bernice, owned a house in Sacramento. Bernice had four adult children: defendant, Donna, Ken, and John. Donna lived with Bernice in the family home. Jack, a family friend, lived in a small cottage or shed on the property. Jack paid Bernice rent until her death in June 2015. He then paid rent to Donna. Donna served as the executor of Bernice's estate. Donna died in April 2018, a couple of months before trial.

A fire broke out on the property in March 2016. The fire destroyed a three-car garage and its contents, including personal property belonging to the siblings. The fire also sparked a family rift between defendant and Ken, on the one hand, and Donna and John, on the other. Each side submitted separate insurance claims for personal property loss from the fire. A dispute developed as to whether defendant and Ken should be entitled to recover their fire losses. The dispute centered on whether defendant and Ken lived in the house prior to Bernice's death, a condition precedent to recovery under her homeowners' policy. The squabble over insurance money was a recurring theme throughout the case and on appeal.

The events leading to the charged offenses occurred in February 2017, when the insurance claims were still pending. Jack was the only prosecution witness to testify to these events. Jack testified that defendant told him Ken would be coming over with insurance papers for him to sign. Ken appeared the next day with papers representing that defendant and Ken had been living at the house. Jack refused to sign, saying the

2

matter was none of his business, and he did not want to be involved. During the trial, Jack explained that he refused to sign the papers because they were false.

Jack testified that he was asleep in the shed in the early morning hours of February 13, 2017, the day after his meeting with Ken. He was suddenly awakened when defendant burst through the door of the shed. Defendant was holding an upraised axe handle, with no axe blade. The axe handle was approximately three feet long, and three inches in diameter. Defendant demanded to know why Jack had refused to sign the papers. Defendant said that Jack would sign if he knew what was good for him and had "better not call police" or tell Donna that he had been there.

Jack testified that defendant said he would " 'fuck [him] up' " and " 'bash [his] fucking head in.' " He also testified that defendant knocked the phone from his hand before he could call police, and then grabbed the phone from the foot of his bed, where it landed. Jack also testified that defendant struck the side of the shed with the axe handle, causing Jack to fear that defendant might strike him as well.

Jack described the following menacing exchange with defendant. According to Jack, defendant said, " 'I just walked by your car when I got here.' " Jack responded, " 'Jim, I've got insurance on the car.' " According to Jack, defendant replied, " 'You got insurance on your head?' " Defendant then threw Jack's phone down and left the shed.

Jack called 911. He told the 911 operator, "My name is Jack [], and I was just—I was just threatened with an axe handle by [defendant]." He also told the 911 operator that defendant and his brother "wanted [him] to sign some papers that said that they lived [t]here at the time of the fire." Jack made a police report the next day.

Linda Amader, an insurance claims adjuster with Allstate Insurance Company, testified for the prosecution as well.[2] Amader recalled meeting with defendant and Ken

---

[2] There were other prosecution witnesses, but their testimony is not relevant to any issue on appeal.

after the fire in March 2016.  She understood from the meeting that defendant and Ken lived at the property.  Amader spoke with Donna three months later.  Donna did not say anything about her brothers' living arrangements.

By February 2017, Amader had approved a $10,000 advance for the garage fire claims, but the claims were still pending.  Amader explained that the advance would have been paid to Donna as executor of Bernice's estate.[3]

Amader testified that she spoke with Donna again in March or April of 2017.  According to Amader, Donna told her that defendant and Ken had not lived in the house prior to Bernice's death.  This was significant, Amader explained, because the policy covered resident relatives of the named insured only, meaning that persons not living in the house prior to Bernice's death would be excluded from coverage.  Amader referred the matter to Allstate's special investigations unit.  Amader explained that the special investigations unit would investigate and determine whether fraud was suspected.  If fraud was not suspected, the claim would return to Amader for payment.  Amader testified that the garage fire claims had not been returned to her for payment.

Defendant presented an alibi defense.  Defendant's former girlfriend, Tina, testified that defendant had been with her at her house on the night of the alleged confrontation.  Armando, a neighbor, testified that he had been in a bedroom approximately 20 feet away from the shed and heard nothing that night.

Ken testified he had arranged for Jack to stay in the shed, but the arrangement was only supposed to be temporary.  Ken acknowledged meeting with Jack on February 12 or February 13, 2017, but said the purpose of the meeting was to let Jack know he needed to leave the shed.  Ken denied presenting Jack with insurance papers or asking him to sign

---

[3] Amader explained that the public adjuster would have also been named as a payee on the check.

anything. He intimated that Donna had misappropriated insurance money from the estate and suggested that Jack had conspired with Donna to effectuate this scheme.

Defendant testified on his own behalf. Defendant claimed he had been with his girlfriend from February 12 through February 15, 2017. He denied Jack's version of events, adding that he would have had no reason to ask Jack to verify that he had been living in the house, as Amader had never requested any such verification. According to defendant, Allstate had already processed his claim by February 2017, and was just about ready to pay it. Defendant explained that Allstate had already paid Ken's claim, but Donna had intercepted the check. To avoid this, defendant said he instructed Allstate to place a hold on his check. Defendant estimated the payout would be approximately $40,000, and said he was confident he would be receiving the money "anytime."

B.     *Closing Arguments and Verdict*

During closing arguments, both the prosecutor and defendant's trial counsel, Attorney Robert McCann, framed the case as a credibility contest between Jack, on the one hand, and defendant, on the other. The prosecutor emphasized that Jack had consistently told the same story and had no stake in the insurance dispute and no reason to lie. McCann responded that Jack had a reason to lie because he wanted to continue living in the shed, and Donna would have allowed him to do that, but defendant and Ken would not. McCann urged the jury to accept the testimony of the defense witnesses over Jack. McCann also intimated that Donna failed to distribute insurance money, and defendant would be pursuing claims against Bernice's estate.

The jury returned a verdict after three hours and 15 minutes of deliberation. The jury found defendant guilty of residential burglary (Pen. Code, § 459—count one)[4], making criminal threats (§ 422—count two), and assault with a deadly weapon (§ 245,

---

[4] Undesignated statutory references are to the Penal Code.

5

subd. (a)(1)—count three).  The jury also found true that defendant personally used a deadly and dangerous weapon (an axe handle) in the commission of the offenses (§ 12022, subd. (b)(1)).

## C.     *The New Trial Motion*

After the jury returned the guilty verdict, defendant retained new counsel, and was later appointed counsel.  Defendant's appointed counsel, Assistant Public Defender John W.H. Stoller, filed a new trial motion asserting various claims, including ineffective assistance of counsel based on a failure to investigate.  As relevant here, the motion argued that McCann should have interviewed John and obtained records from Allstate.[5]

The motion was supported by a declaration from defendant.  Defendant averred that Donna and Jack had a special relationship, and Jack fabricated the alleged confrontation as part of a scheme to deprive defendant of insurance money.

The motion was also supported by a declaration from Stoller, attaching witness interviews and correspondence from McCann's pretrial investigation.  Stoller opined that McCann should have done more to develop the defense theory that Donna conspired with Jack to prevent defendant from receiving insurance money.  Among other things, Stoller opined that McCann should have interviewed John and obtained records from Allstate.

Stoller's declaration attached a witness statement from John, prepared after the trial by an investigator from the public defender's office.  The statement indicates that Donna struggled with alcohol.  The statement also indicates that defendant lived in the house prior to Bernice's death.  Of greatest significance, the statement indicates that John would have testified as follows:   "[Defendant] did not get any insurance money, but he did get money from the sale of the house.  We split the money from the house evenly among the four siblings.  [Defendant] did live at the house when the fire broke out, but

---

[5] The motion also argued that McCann should have interviewed Donna and obtained her bank records.  Defendant does not renew these contentions on appeal.

6

we lied and told the insurance company that he didn't. Donna did not feel that [defendant] deserved any money from the fire. Donna never wanted [defendant] living at the house because he did not pay for a thing and only ran up the utility bill. Our parents would have never let him get away with something like that. That's why this whole incident involving Jack took place. [Defendant] was trying to get Jack to sign a paper saying that he lived there. Jack refused to sign anything because he knew we didn't want [defendant] to get any insurance money. Then [defendant] threatened Jack and he definitely wasn't willing to sign anything." Stoller's declaration also attached records from Allstate, including a letter from an attorney suggesting that Donna had attempted to defraud the insurance company by making false claims for lost rent.

The prosecution opposed the motion. The prosecution argued that McCann reasonably decided to present an alibi defense, rather than an insurance fraud defense. The prosecution observed that John's statement "cuts both ways for the defense and prosecution," inasmuch as John admitted conspiring with Donna and lying to the insurance company, but also indicated that defendant committed the charged offenses against Jack. The prosecution also argued that, even assuming McCann's performance was deficient, defendant suffered no prejudice.

The trial court heard argument and ruled from the bench. The trial court acknowledged that "additional evidence of the fraud may have generally strengthened the defendant's case." Nevertheless, the trial court implicitly found that a reasonable defense lawyer could have concluded that, "qualitatively the alibi evidence and, therefore, the evidence of [d]efendant's innocence, provided a better strategic defense than in providing more of a challenge to the victim's credibility." With respect to John's statement, the trial court observed: "Even if the jury absolutely believed that Donna and John engaged in insurance fraud, that does not mean that [d]efendant did not assault [Jack]. In fact, it could be perceived as a reason for the assault and that's one of the things that the People were arguing. Defendant could have assaulted [Jack] out of frustration that was borne

7

from Donna's insurance fraud." "But critically," the trial court explained, "evidence of Donna's insurance fraud really only has value if it's connected to [Jack]'s motive to falsely accuse the defendant." The trial court found that defendant failed to establish any such connection.

The trial court observed there was no evidence that Donna imparted any financial consideration to Jack. As for the allegation that Donna and Jack had a special relationship, the trial court found it "odd that [Jack] would continue to live in the shed rather than in the main house with Donna when there's spare bedrooms in the house at the time." The trial court also reasoned that, given the absence of evidence connecting Donna and John's fraud to Jack, "it may have been even more beneficial to leave the jury to speculate as to [Jack]'s motive to testify falsely rather than to provide evidence that [fails] to link [Jack] to the insurance fraud."

When all was said and done, the trial court found that McCann "offered a viable, absolute defense to the jury. And it can't be said under the circumstances [that] his failure to present more evidence of a possible motive to lie . . . fell below an objective standard of reasonableness. [¶] Also, it can't be said that there is a reasonable probability [that] but for counsel's unprofessional errors, if there were any, that a determination more favorable to the defendant would have resulted." Accordingly, the trial court denied the motion. The trial court then sentenced defendant to three years eight months in state prison. This appeal timely followed.

## II. DISCUSSION

A. *Ineffective Assistance of Counsel*

Ineffective assistance of counsel is a valid ground for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) Upon appeal from the denial of a new trial motion based on a claim of ineffective assistance, we defer to the trial court's factual findings if supported by substantial evidence, and we exercise de novo review over the

8

ultimate issue of whether defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

To establish a claim of ineffective assistance of counsel, a defendant must show: (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

In examining whether a defendant has met his burden under the first prong, we give great deference to counsel's reasonable tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) A defendant must establish that the challenged act or omission did not result from an informed tactical choice within the range of reasonable competence. (*People v. Pope* (1979) 23 Cal.3d 412, 425, disapproved on a different ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and to rebut this presumption the record must affirmatively disclose that counsel had no rational tactical purpose for his or her act or omission. (*Pope, supra,* at p. 425; *People v. Jones* (2003) 29 Cal.4th 1229, 1254.) "[I]f the record contains no explanation for the challenged behavior, [the] court [must] reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

To establish ineffective assistance based on an alleged failure to investigate, a defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious

defense." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.) " ' "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." ' " (*In re Thomas* (2006) 37 Cal.4th 1249, 1258.) Appellate courts must refrain from second-guessing trial counsel, since " ' "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." ' " (*Ibid.*)

We cannot say McCann was ineffective in failing to obtain records from Allstate. McCann could have reasonably believed that an alibi defense offered defendant a better chance of acquittal than any defense that might have been suggested by the Allstate records. An alibi defense would be easy for jurors to understand and would allow McCann to frame the case as a credibility contest between a single prosecution witness (Jack), on the one hand, and an array of defense witnesses (defendant, Ken, Tina, and Armando), on the other. An insurance-themed defense, by contrast, would require the jury to connect the dots between Donna's dishonest dealings with Allstate and Jack's allegations; a nexus that, even now, defies ready explanation. Even assuming McCann had reason to suspect Donna of attempting to defraud Allstate or breaching her fiduciary duties as executor, an experienced trial lawyer could reasonably anticipate that such discovery would be unlikely to meaningfully assist the defense. McCann made a reasonable tactical decision to focus on corroborating defendant's alibi, rather than pursuing tangentially related records from Allstate. There was no ineffective assistance of counsel so far as the Allstate records are concerned.

McCann's failure to interview John presents a closer question, but here too, we are satisfied that defendant received effective representation. As noted, John gave a statement to the public defender's investigator acknowledging that he and Donna lied to

Allstate about defendant's living arrangements because Donna thought defendant should not receive any insurance money. Defendant argues McCann should have interviewed John and presented this testimony at trial. Had McCann done so, defendant urges, the jury would have had a basis for finding that Jack was also lying about defendant's living arrangements. Jurors could have then inferred that Jack fabricated the assault allegations at Donna's behest, in furtherance, somehow, of her scheme to deprive defendant of insurance money. Had McCann interviewed John, defendant concludes, evidence of Jack's possible dishonesty would have been brought to light and could have tipped the balance in defendant's favor. We are not persuaded.

John was not a percipient witness to any of the acts that formed the basis of the charges against defendant. At most, he would have been able to provide background information concerning the family's insurance dispute. But there was no reason for McCann to believe that John's perspective would have been especially helpful to the defense. McCann can be presumed to have known from defendant that Donna and John occupied one side of the family split, and defendant and Ken occupied the other. Knowing this, McCann could have reasonably expected that John would be hostile to the defense. That expectation would have been confirmed by the prosecution's apparent decision to name John as a possible witness.[6] Armed with an understanding of the family's contentious history and dynamics, McCann could have reasonably anticipated that John would undermine defendant's cause, rather than advance it. McCann was not ineffective for failing to interview John.[7]

_____

[6] We have not been provided the prosecution's witness list; however, defendant's opening brief indicates that John "was listed by the People as a possible witness at trial."

[7] We note in passing that defendant's declaration identifies several leads McCann should have pursued but does not suggest that he should have interviewed John.

11

But even assuming McCann's investigation was inadequate, we would find no prejudice. Assuming that John's testimony would have been consistent with his statement, the jury would have heard that Donna and John lied to Allstate, and defendant responded by demanding that Jack sign papers, and making threats about what would happen if he refused. Had McCann interviewed John and presented this testimony, he might have succeeded in challenging Jack's credibility on a minor issue (whether defendant lived in the house), but he would have bolstered Jack's credibility on a major issue (whether defendant threatened Jack and demanded that he signed papers), thereby doing defendant more harm than good.[8] McCann could have reasonably anticipated that John's testimony would not be worth the risk, and there would be little to be gained from interviewing him.

Defendant observes that the alibi and insurance-themed defenses were not mutually exclusive, and McCann could have pursued both avenues of investigation. Defendant's defenses may have been logically compatible, but that does not mean McCann had the ability to vigorously pursue both. "Resources are limited, and trial counsel must eventually shift from pretrial investigation to trial preparation." (*Campbell v. Reardon* (7th Cir. 2015) 780 F.3d 752, 765.) Nothing in the record suggests McCann was unaware of the insurance dispute or refused to consider using the dispute to defendant's advantage. To the contrary, the record reveals that McCann alluded to

_____

[8] Defendant seems to believe that John's testimony would have dealt a devastating blow to Jack's credibility. We are not so sure. Jack's testimony suggested that neither Ken nor defendant lived in the house at the time of the alleged assault. John's statement raised an inference that defendant did not live in the house at the time of the fire. Both propositions could have been true, and both could have been reconciled with other evidence that defendant stayed there sometimes but was not living there regularly at the time of Bernice's death.

12

Donna's schemes in closing argument and suggested that Jack's allegiance to Donna gave him a reason to lie. But McCann could have reasonably viewed the insurance squabble as a side issue, which was only tangentially related to the ultimate question of guilt or innocence. And, though credibility was a key issue, McCann could have reasonably believed that defendant's credibility would be more meaningfully bolstered by corroborating his alibi, rather than pursuing evidence that could prove him right about an ancillary issue. We decline to second-guess McCann's allocation of investigative resources. (*In re Thomas, supra,* 37 Cal.4th at p. 1264, fn. 4 ["Courts must be careful not to second-guess resource allocation; it is for counsel to decide what leads are or are not worth exploring"].)

On the record before us, we cannot say that McCann's focus on defendant's alibi defense was anything other than an informed tactical choice. It follows that defendant has failed to show ineffective assistance of counsel, or any abuse of discretion in the denial of his motion for a new trial.

B.      *Sufficiency of Evidence of Assault with a Deadly Weapon*

Next, defendant argues there was insufficient evidence to support his conviction for assault with a deadly weapon. In reviewing a challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence to support the jury's findings. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) We conclude substantial evidence supports the jury's verdict.

Section 245, subdivision (a)(1) punishes assaults committed "with a deadly weapon or instrument other than a firearm."[9] As used in the statute, the term " ' "deadly

---

[9] Section 245, subdivision (a)(1) provides in full: "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a

13

weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*In re B.M.* (2018) 6 Cal.5th 528, 532-533 (*B.M.*).) Section 245, subdivision (a)(1) contemplates two categories of deadly weapons. Objects such as dirks and blackjacks are deadly weapons as a matter of law because their ordinary use establishes their character as such. (*Id.* at p. 533.) Other objects, while not deadly per se, may be used in a manner likely to produce death or great bodily injury. (*Ibid.*) An axe handle cannot be considered an inherently deadly or dangerous weapon. (Cf. *People v. Aledamat* (2019) 8 Cal.5th 1, 6 ["Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons"].) Whether an object that is not inherently deadly or dangerous was used as a deadly weapon is a question of fact for the jury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

Our Supreme Court established guidelines for determining whether a non-inherently dangerous object—such as a knife—was used in a manner likely to produce death or great bodily injury in *B.M.* (*B.M., supra,* 6 Cal.5th at pp. 533-536.) There, 17-year old B.M. used a three-inch butter knife with a dull tip and serrated edge to scare her sister, Sophia. (*Id.* at p. 531.) When Sophia saw B.M. approaching with the butter knife, she covered herself with a blanket. (*Ibid.*) B.M. made several downward slicing motions with the knife in the area near Sophia's blanketed legs. (*Ibid.*) Although the butter knife made contact with Sophia's legs, the knife neither pierced the blanket nor caused injury to Sophia. (*Ibid*.)

The juvenile court found B.M.'s use of the butter knife violated section 245, subdivision (a)(1), and the court of appeal affirmed. (*B.M., supra,* 6 Cal.5th at p. 530.) Our Supreme Court reversed, announcing three principles to be applied in such cases.

---

county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."

(*Id.* at pp. 530, 533-536.) "First," the court explained, "the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely to produce* death or great bodily injury." ' " (*Id.* at p. 533.) This requires more than a mere possibility that serious injury could have resulted from the object used. (*Ibid.*)

Second, conjecture as to how the object might have been used is not permitted. (*B.M., supra,* 6 Cal.5th at p. 534.) "Rather, the determination of whether an object is a deadly weapon under section 245[, subdivision ](a)(1) must rest on evidence of how the defendant actually 'used' the object." (*Ibid.*) Although "it is inappropriate to consider how the object could have been used as opposed to how it was actually used," the Supreme Court explained, "it is appropriate in the deadly weapon inquiry to consider *what harm could have resulted from the way the object was actually used.* Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*Id.* at p. 535, italics added.)

Third, "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*B.M., supra,* 6 Cal.5th at p. 535.) Nevertheless, an aggravated assault conviction does not require proof of any injury or even physical contact. (*Ibid.*)

Applying these principles, we conclude substantial evidence supports the jury's determination that defendant used the axe handle as a deadly weapon in a manner likely to produce great bodily injury under section 245, subdivision (a)(1). Defendant burst into the shed holding an axe handle in his upraised hand. The axe handle was composed of wood or hard plastic, and was approximately three feet long, and three inches in diameter. Defendant stood two or three feet from Jack and swung the axe handle, hitting the side of the small shed, and producing a loud noise. The jury could reasonably infer

15

that the axe handle was capable of inflicting serious injury when swung with sufficient force, within close range of another person. (See *People v. McCullin* (1971) 19 Cal.App.3d 795, 801 ["baseball bat can be a deadly weapon because of the manner in which it is used" for purpose of probation condition]; *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 835 [wooden stick 18 to 20 inches long and one inch in diameter was deadly weapon for purpose of weapon enhancement].) Both the nature of the axe handle and the manner in which it was used suggest that great bodily injury was likely. (See *B.M., supra,* 6 Cal.5th at p. 533.)

Defendant makes much of the fact that he did not make contact with Jack. However, the actual occurrence of great bodily injury is not required for a conviction under section 245, subdivision (a)(1). (*People v. Aguilar, supra,* 16 Cal.4th at p. 1028 ["One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial"].) Defendant also points to Jack's testimony that, "thinking back," he was not sure whether defendant was trying to strike him or only scare him. However, Jack clarified that he believed in the moment that defendant would "probably" hit him, given their close proximity in a confined space and defendant's threats to " 'bash [his] fucking head in.' " The jury was free to credit Jack's testimony that defendant used the axe handle in a manner likely to produce great bodily injury, despite Jack's doubts as to what defendant may have intended.

From the way that defendant wielded the axe handle, we conclude there was more than a mere possibility that Jack would have suffered serious bodily injury had defendant struck him while swinging the bludgeon in a small, confined space. The record thus contains substantial evidence that defendant used the axe handle in a manner that was both capable of producing and likely to produce serious bodily injury.

16

## III. DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

BLEASE, Acting P. J.

/S/

MURRAY, J.

17